Joseph V. MANNING, as President of the American Airlines Chapter, Flight Engineers' International Ass'n, et al., Plaintiffs-Appellees,

v.

AMERICAN AIRLINES, INC., Defendant-Appellant.

No. 177, Docket 28461.

United States Court of Appeals Second Circuit.

Argued Oct. 22, 1963.

Decided Feb. 14, 1964.

See also 221 F.Supp. 301.

Arthur M. Wisehart, New York City (George A. Spater, H. Wayne Wile, New York City, of counsel), for American Airlines, Inc., defendant-appellant.

Asher W. Schwartz, O'Donnell & Schwartz, New York City (Walter N. Kaufman, New York City, of counsel), for plaintiffs-appellees.

John E. Stephen, Washington, D. C., submitted a brief for Air Transport Ass'n of America as *amicus curiae*.

Before LUMBARD, Chief Judge, and MEDINA and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This appeal concerns another phase of the controversy between American Airlines, Inc. and its flight engineers discussed in the opinions in Ruby v. American Airlines, Inc., 2 Cir., 329 F.2d 11. At the same time that it signed the basic agreement of May 1, 1958, with its Chapter of Flight Engineers' International Association, which was to "continue in full force and effect until April 30, 1963 and shall renew itself without change until each successive April 30 thereafter unless written notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act, as amended, by either party hereto at least sixty (60) days prior to April 30 in any year after April 30, 1962," American executed another agreement for the check-off of union dues of engineers who signed a prescribed authorization form. This check-off agreement was to "continue in full force and effect until April 30, 1963, and shall be subject to renewal thereafter only by mutual agreement of the parties hereto." American's February 28, 1963 "opener" under the basic agreement excluded "the dues-checkoff agreement which expires of its own terms on April 30, 1963." Although the Chapter's February 28 "opener" did not refer to the check-off agreement, the Chapter gave notice on March 8 of a desire to change the latter so that it would have a termination date and a self-renewal clause similar to the proposed new basic agreement. American discontinued the check-off of dues on May 1, 1963. In an action brought by the Chapter, Judge Wyatt issued an order directing it to resume this, from which it appeals.

Validity of the order turns primarily on § 6 of the Railway Labor Act, 45 U.S.C. § 156. The first sentence of that section requires 30 days' written notice of "an intended change in agreements affecting rates of pay, rules, or working conditions." The second sentence says that where such notice has been given, and in certain other instances not here material, "rates of pay, rules, or working conditions shall not be altered by the carrier" until the controversy has been finally acted upon by the Mediation Board or until a lapse of ten days after conferences without request for or proffer of its services—events which have not here occurred.

 The propriety of an injunction to enforce the then unique provisions of the Railway Labor Act for maintaining the *status quo* while the parties to a labor dispute pursue various stages of negotiation, mediation or arbitration, was established long ago. Texas & N. O. R. R. v. Brotherhood of Ry. Clerks, 281 U.S. 548, 565–566, 50 S.Ct. 88, 74 L.Ed. 608 (1930). Although the Texas & N. O. decision antedated the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, the debates on that Act, 75 Cong.Rec. 5503–04 (1932), made clear that it was not intended to apply to injunctions of this nature. See Railroad Yardmasters v. Pennsylvania R. R., 224 F.2d 226 (3 Cir. 1955); Chicago, R. I. & P. R. R. v. Switchmen's Union, 292 F.2d 61, 63–64, 66 (2 Cir. 1961), cert. denied, 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962).

American's principal argument, in which it is joined by the Air Transport Association of America as *amicus curiae*, is that § 6 is inapplicable because the check-off is a "specialized" agreement with a fixed termination date and without the self-renewal provisions of the basic agreement. Stated so broadly the argument is wholly without force. The effect of § 6 is to prolong agreements subject to its provisions regardless of what they say as to termination. If the basic agreement of 1958 had no automatic renewal clause, § 6 would have nonetheless applied; unless the terms of the agreement were still to be followed there would be "an intended change," which would bring into play the thirty-day notice provision of § 6 and with it the requirement of the second sentence that the *status quo* be maintained until compliance with all the demands of the section was had. Indeed, the current effectiveness of the wage and hour clauses of the basic agreement, which American does not contest, is due solely to the second sentence of § 6, since automatic renewal was prevented by the openers.

A stronger form of the argument is that the contrast of the language of the check-off agreement—"shall be subject to renewal thereafter only by mutual agreement of the parties hereto" —with the automatic renewal language of the basic agreement, and of two side agreements, warrants the conclusion that the parties did not mean § 6 to apply. Passing the question whether and how parties subject to the Railway Labor Act can lawfully make agreements "affecting rates of pay, rules or working conditions" so that these will not be subject to § 6, as might be convenient when unusual situations of short duration arise within the period of a basic contract, we think the argument puts more strain on the words of the check-off agreement than these will bear. In our view the different language meant only that automatic renewal of the basic agreement would not carry the check-off agreement along with it. It is no answer that § 6 thus gives identical effect to two intentionally dissimilar provisions; the very purpose of § 6 is to stabilize relations by artificially extending the lives of agreements for a limited period regardless of the parties' intentions.

American was thus required to maintain the check-off if, but only if, this comes within the phrase "rates of pay, rules, or working conditions"—a phrase in § 6 which springs from the original Railway Labor Act of 1926, 44 Stat. 582, and was left unchanged when the Act was amended in 1934, 48 Stat. 1197. We see little force in American's claim that Congress could not have in-

tended a check-off agreement to be comprehended by these words since § 2 Fourth of the Railway Labor Act made all such agreements unlawful until § 2 Eleventh was added in 1951, 64 Stat. 1238. A statute taxing "beverages," enacted during the prohibition era, would surely include hard drinks when these became lawful, as well as soft ones. But the question remains whether an agreement which, as American argues, affects only the employees' relations with their union, as distinguished from matters such as hours, seniority or safety, is a "working condition."

■■ We are persuaded that it is. "*Working conditions*" is a broad term. The Act uses the same phrase "rates of pay, rules, or working conditions" in §§ 3 First (i) and 204, 45 U.S.C. §§ 153 First (i) and 184, relating to boards of adjustment, where the desire was rather plainly to be as comprehensive as possible; we find it difficult to believe that if during the term of the agreement the Chapter had complained of an inadequacy in the check-off and had refused to submit the issue to a board of adjustment, American would not have thought itself entitled to the powerful remedy which the Act gives when a union declines to arbitrate such a dispute. See Brotherhood of Railroad Trainmen v. Chicago River & I. R. R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1937). The check-off has been held to come within the provisions of the National Labor Relations Act, §§ 8(a) (5) and 9(a), requiring an employer to bargain with the employees' designated representative "in respect to rates of pay, wages, hours of employment, or other conditions of employment." N. L. R. B. v. Reed & Prince Mfg. Co., 205 F.2d 131, 136 (1 Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); cf. Switchmen's Union of North America v. Southern Pac. Co., 253 F.2d 81, 84 (9 Cir.), cert. denied, 358 U.S. 818, 79 S.Ct. 29, 3 L.Ed.2d 60 (1958). The purpose of § 6 was to prevent rocking of the boat by either side until the procedures of the Railway Labor Act were exhausted; interpreting "working conditions" to include an agreed check-off accomplishes that purpose better than a narrower construction.

■ American's claim that the controversy was within the exclusive jurisdiction of the board of adjustment under § 204 overlooks that what is here involved is not "the interpretation or application" of the check-off agreement, which admittedly expired on April 30, 1963, but the application of § 6 of the Railway Labor Act. The many other arguments advanced do not warrant discussion.

Affirmed.