**BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYES, AFL–CIO, Appellant,**

v.

**REA EXPRESS, INC., Debtor, REA Express, Inc., Debtor-in-Possession, Appellee.**

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Appellant,**

v.

**REA EXPRESS, INC., Debtor, REA Express, Inc., Debtor-in-Possession, Appellee.**

**Nos. 1220, 1221, Dockets 75–5007, 75–5008.**

United States Court of Appeals, Second Circuit.

Argued June 27, 1975.

Decided Aug. 27, 1975.

Certiorari Denied Dec. 8, 1975. See 96 S.Ct. 451.

Certiorari Denied Jan. 19, 1976. See 96 S.Ct. 855.

Sheldon Engelhard, New York City (Robert L. Jauvtis, Vladeck, Elias, Vladeck & Lewis, P. C., New York City, of counsel), for appellant International Association of Machinists and Aerospace Workers, AFL–CIO.

David J. Fleming, New York City (Reilly, Fleming & Reilly, New York City, James L. Highsaw, Highsaw & Mahoney, Washington, D. C., William J. Donlon, Rosemont, Ill., of counsel), for appellant Brotherhood of Railway and Airline Clerks.

Arthur S. Olick, New York City (John C. Russell, Jane S. Solomon, Anderson, Russell, Kill & Olick, P. C., New York City, of counsel), for appellee REA Express, Inc.

Before CLARK,* Associate Justice, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Once again we are called upon, within a matter of weeks, to determine whether a trustee or debtor-in-possession in bankruptcy under the Bankruptcy Act may, under § 313(1) of that Act, 11 U.S.C. § 713(1), disaffirm executory collective bargaining agreements entered into by the debtor. In *Shopmen's Local Union No. 455, et al., and NLRB v. Kevin Steel Products, Inc.,* 519 F.2d 698, Dkt. Nos. 74–1872, 74–2154 (2d Cir., July 24, 1975), we held that § 313(1) permits the bankruptcy court to authorize a trustee or debtor-in-possession to reject a collective bargaining agreement governed by the National Labor Relations Act upon a showing that it is onerous and burdensome and that the equities tip decidedly in favor of termination. In the present case we similarly hold that executory collective bargaining agreements subject to the provisions of the Railway Labor Act, 45 U.S.C. § 151 *et seq.,* may be rejected but remand the case for further determination as to whether the agreements in issue are sufficiently onerous and burdensome to warrant grant of such authority pursuant to § 313(1).

REA Express, Inc. ("REA" herein), a corporation engaged in the surface and air transport of express shipments, is a party to separate collective bargaining agreements with two unions (the "unions" herein), the Brotherhood of Railway, Airline and Steamship Clerks ("BRAC" herein) and the International Association of Machinists and Aerospace Workers ("IAM" herein). These agreements govern the wages and working conditions of approximately 6,600 persons of some 7,600 currently employed by REA. The agreements expire on December 31, 1975, and June 1, 1976, respectively. In addition to matters usually covered in a collective bargaining agreement, the agreements substantially affect REA's right to close or consolidate facilities and transfer or lay off workers. In particular, both agreements require payment of supplementary unemployment benefits to workers who are laid off, and the BRAC agreement provides that workers who elect to follow their work in a consolidation are entitled to

* Supreme Court of the United States, retired, sitting by designation.

free transportation and other allowances for the dislocation. Under the BRAC agreement, transfers and consolidations can be effected by REA only upon notice to the union and with substantial delays. BRAC, furthermore, may demand arbitration of a dispute over the effects of a consolidation.

On February 18, 1975, REA and several affiliated companies filed petitions under Chapter XI, § 322 of the Bankruptcy Act, 11 U.S.C. § 722 *et seq.,* and by court order REA was continued as debtor-in-possession of its property. On March 24 REA moved pursuant to § 313(1) of the Bankruptcy Act, 11 U.S.C. § 713(1),[1] and Rule 11–53 of the Rules of Bankruptcy Procedure, for an order permitting rejection of the BRAC and IAM agreements as onerous and burdensome. In support of this motion, REA presented evidence, accepted by the Bankruptcy Judge, that it had incurred substantial liabilities as debtor-in-possession, had an outstanding payroll liability of over four million dollars, and was unable to meet its expenses on a current basis. REA claimed that it could not continue to operate without significantly reducing costs, and had developed a plan for drastic curtailment and consolidation of its operations. In sum, the collective bargaining agreements are claimed to be onerous and burdensome because (1) their supplemental unemployment and consolidation provisions would completely forestall the debtor, which is insolvent, from adopting and implementing a reorganization plan that would enable it to survive, and (2) the debtor cannot meet the full wage scales provided for in the agreements.

While fully accepting the evidence of REA's economic plight, Bankruptcy Judge Galgay nonetheless denied authority to disaffirm the two contracts, holding that "this is not the kind of rejection or disaffirmance intended by Congress nor would it be within the overall scheme of Chapter XI." REA immediately appealed this decision to the Southern District of New York, see 11 U.S.C. § 67(c), where Judge Wyatt reversed. Judge Wyatt found on his review of the record that the agreements were onerous and burdensome "in any ordinary sense" and concluded that there was no limitation on the type of executory contract which a trustee or debtor-in-possession was permitted by § 313(1) to reject.

## DISCUSSION

In *Kevin Steel* we faced the question of whether a debtor-in-possession under Chapter XI of the Bankruptcy Act, which is subject to the National Labor Relations Act, may be authorized by the district court to reject an executory collective bargaining agreement. We concluded that such authority is to be found in the broad language and purpose of § 313(1) which provides, without qualification, that the court may "permit the rejection of executory contracts of the debtor". Although § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), to which *Kevin Steel Products, Inc.* was subject, prohibits any party to a collective bargaining agreement from terminating or modifying it unilaterally prior to exhausting certain negotiating procedures, we reasoned that, unless and until the agreement is assumed by the debtor-in-possession, the latter, being a different entity from the pre-bankrupt company, is not a "party" to the agreement and hence not subject to § 8(d)'s termination restrictions with respect to it.

Thus the tension between the Bankruptcy Act's policy in favor of giving the debtor a new start and the Labor Act's policy of encouraging enforcement of collective bargaining agreements was resolved by holding that, absent a clear

---

1. Section 313(1) of the Bankruptcy Act, 11 U.S.C. § 713(1), provides:

"Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties conferred and imposed upon it by this chapter—

"(1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interest as the court may designate."

Congressional mandate to the contrary, such as that specified in § 77(n) of the Bankruptcy Act, 11 U.S.C. § 205(n), with respect to "railroad employees", the enforcement of a collective bargaining agreement must yield to the bankruptcy court's power to relieve the debtor's successor in bankruptcy immediately of onerous and burdensome executory contracts. At the same time we decided that a bankruptcy court must scrutinize with particular care applications for rejection of collective bargaining agreements, carefully balancing the equities on both sides in light of the Labor Act's policy. The case was accordingly remanded to the district court for a more thorough discretionary reconsideration of the advisability of authorizing rejection of Kevin Steel's collective bargaining agreement.

The central question before us in this case is whether a collective bargaining agreement subject to the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, is governed by the same principles. The unions maintain that the RLA's plain language prohibits any such rejection of a collective bargaining agreement made by the debtor-carrier except in the manner prescribed by that Act. We disagree. The face of the RLA, it is true, appears at first glance to lend some support to the unions' position. A "carrier" is defined by § 1 of the RLA to include "any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the business of any such 'carrier'. . . ." 45 U.S.C. § 151.[2] Section 2 of the RLA then provides that:

> "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title." 45 U.S.C. § 152, Seventh.

In addition, § 6 of the RLA, 45 U.S.C. § 156, (referred to above in § 2 as "sec-

tion 156 of this title") obligates a carrier to utilize a protracted procedure for resolution of differences with respect to any proposed changes in a collective bargaining agreement, pending completion of which the carrier must maintain the status quo, even if the agreement has expired. See *Manning v. American Airlines, Inc.,* 221 F.Supp. 301 (S.D.N.Y. 1963), *aff'd.,* 329 F.2d 32 (2d Cir.), *cert. denied,* 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964). Section 6 requires that at least thirty days' written notice be given of any intended changes in rates of pay, rules or working conditions and it requires conferences to be held with respect to the changes. The RLA further provides for submission of disputes to the National Mediation Board, see 45 U.S.C. § 155, if requested by either party or if the Board proffers its services. Section 6 also specifies that, pending the exhaustion of these procedures, "rates of pay, rules, or working conditions shall not be altered by the carrier . . . ."

■ The purpose of these provisions of the RLA, like that of § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), which was before us in *Kevin Steel,* is to avoid disruptions of commerce by forcing the parties to exhaust collective bargaining procedures and, where the RLA applies, to encourage use of arbitration and mediation before engaging in self-help, strikes or other forms of unilateral action. The unions contend that a trustee or debtor-in-possession, being a "carrier", is obligated to use the foregoing statutory notice, conference and mediation procedures before it may make any change in its collective bargaining agreements.

In response to this argument, REA points to the broad language of § 313(1) of the Bankruptcy Act, which without qualification authorizes the Bankruptcy Court to "permit the rejection of executory contracts of the debtor", 11 U.S.C. § 713(1). This section enables the court

---

**2.** The National Labor Relations Act likewise applies to "legal representatives, trustees, trustees in bankruptcy, or receivers", 29 U.S.C.

§ 152, see *Durand v. NLRB,* 296 F.Supp. 1049, 1055 (W.D.Ark.1969).

to implement the policy of Chapter XI, which is to permit the debtor-in-possession to deal with the debtor's property in a way that will enable it to survive, by relieving it of executory contracts that would threaten or prevent its survival. As Judge Wyatt observed, the Bankruptcy Act places no restriction on the type of executory contract which may be rejected under this section. See 8 *Collier on Bankruptcy* 199 (14th ed.). Furthermore, as we noted in *Kevin Steel,* Congress, by enacting § 77(n) of the Bankruptcy Act, 11 U.S.C. § 205(n), which excepts "railroad employees" from the operation of § 313(1), demonstrated that it "knew how to remove labor agreements from the scope of a general power to reject executory contracts", at 704.[3] Both courts having held below, and the unions having conceded, that the collective bargaining agreements are "executory" as to their unexpired terms, REA argues that the Bankruptcy Act's plain language must prevail.

■■■ Faced with this apparent conflict in the language and purposes of the RLA and the Bankruptcy Act we must give effect to both statutes to the extent that they are not mutually repugnant. In the present case we are persuaded, as we were in *Kevin Steel,* that this can be accomplished by holding that where, after careful weighing of all of the factors and equities involved, including the interests sought to be protected by the RLA, a district court concludes that an onerous and burdensome executory collective bargaining agreement will thwart efforts to save a failing carrier in bankruptcy from collapse, the court may under § 313(1) authorize rejection or disaffirmance of the agreement. To hold

that the RLA precludes rejection under such circumstances would ultimately be to defeat the purpose of the RLA itself, which is to avoid disruption of commerce by insuring that the carrier will continue operations pending resolution of labor disputes, since the end result could well be to preclude financial reorganization of the carrier and thus lead to its demise. There then would simply be no operations left to disrupt. If REA's collective bargaining agreements with the unions, for instance, are too onerous and burdensome to permit it to survive, no purpose would be served by obligating it to resort to RLA negotiating procedures, which assume that the carrier involved is viable and will be able to meet its payroll and contractual obligations to employees and other creditors.[4]

■■■ When a carrier goes into bankruptcy and does not have the funds to continue operations indefinitely at existing levels and labor costs pending exhaustion of the protracted statutory RLA procedures for modification of its collective bargaining agreements, § 313(1) must govern. The practical effect of § 313(1) is to force all creditors doing business under executory contracts with the debtor in economic distress to renegotiate their mutual rights, relinquishing some in order to maintain the enterprise as a going concern so that they can at least realize a substantial percentage of what they would otherwise receive. It is a rare case when the financial distress of an enterprise in bankruptcy does not work a hardship on its creditors, including those who render services to the debtor. No reason is shown why the unions and the employees represented by them should under such

---

**3.** Section 77(n) of the Bankruptcy Act, 11 U.S.C. § 205(n), provides:

"No judge or trustee acting under this [Act] shall change the wages or working conditions of railroad employees except in the manner prescribed in [the Railway Labor Act] . . . ."

**4.** Although Congress in § 77(n) of the Bankruptcy Act precluded federal courts from changing the terms and conditions of employment of railroad workers, it made this exception because railroads, being entitled to the unique benefits of railroad reorganization under § 77 of the Bankruptcy Act, did not come under Chapter X of that Act. See H.R.Rep. No. 1897, 72d Cong., 2d Sess. (1933); Sen.Rep. No. 92–1158, 92d Cong., 2d Sess. (1972).

circumstances be permitted to insist upon strict compliance with their executory agreements with REA.

When REA, after going into Chapter XI proceedings, was authorized to operate as the debtor-in-possession, it acted as a new juridical entity. It was not a party to and was not bound by the terms of the collective bargaining agreement entered into by REA as debtor, see *Shopmen's Local Union No. 455, et al., and NLRB v. Kevin Steel Products, Inc., supra,* at 704; *In re Capital Service, Inc.,* 136 F.Supp. 430, 434 (S.D.Cal.1955), unless and until the contract should be assumed, either expressly or conforming to its terms without disaffirmance, see *In re Public Ledger, Inc.,* 161 F.2d 762, 767 (3d Cir. 1947).[5] Although a debtor-in-possession such as REA is not bound to assume the collective bargaining agreements of its predecessor, it as a new employer is obligated to bargain collectively with the representative of the employees hired by it. The Supreme Court so held with respect to a new employer in a case governed by the NLRA, *NLRB v. Burns Security Services,* 406 U.S. 272, 277–81, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and the result under the RLA is the same. Moreover, a trustee or debtor-in-possession, being a "carrier", is expressly obligated by § 2 of the RLA to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . ." 45 U.S.C. § 152. This language has been interpreted to impose a positive duty on the carrier to bargain with the employees' certified representative. *Chicago & N.W. Ry. Co. v. United Transportation Union,* 402 U.S. 570, 574–76, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *Virginia Ry. Co. v. System Federation No. 40,* 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

The question crucial to the present case is whether, in addition to being required to bargain with the unions as representatives of the employees, the debtor-in-possession, as a new employer, is also obligated to maintain the status quo, i. e., adhere to the terms and conditions of employment presently in effect pending negotiations with the unions for collective bargaining agreements. In *NLRB v. Burns Security Services, supra,* the Supreme Court considered the applicability of such a requirement to a successor-employer subject to the NLRA which was obligated to bargain with a union. In that case Burns had replaced another employer in providing security services at a certain plant. Burns hired for itself 27 of the plant guards employed by the predecessor, and brought in 15 of its own employees. The Court held that, although Burns had a duty to bargain with the representative of the employees of the predecessor, it had no obligation to refrain from changing the terms of employment before such bargaining occurred. As a new employer, Burns was held to have a right unilaterally to set the initial terms on which it would hire employees. Moreover, the Court stated, to bind a successor-employer to the terms of its predecessor's collective bargaining contract could, where the terms of the agreement were onerous, discourage or inhibit a potential successor from taking over a failing business. Thus a new employer, it was emphasized, must be granted certain prerogatives at the outset in making changes in the method of operation, business structure and labor arrangements of a venture. Otherwise, the free flow of capital and efforts to revive or expand a weak enterprise might be frustrated.

These principles are particularly applicable to the efforts of a trustee or debtor-in-possession to save a carrier from complete collapse and liquidation. Unless the debtor-in-possession is permitted to act promptly, albeit unilaterally, in avoiding onerous employment terms that

---

**5.** We construe *Burke v. Morphy,* 109 F.2d 572 (2d Cir.), *cert. denied,* 310 U.S. 635, 60 S.Ct. 1078, 84 L.Ed. 1404 (1940), relied upon by appellants, as also dealing with a situation in which the receiver had implicitly adopted the debtor's labor agreements.

will prevent it from continuing as a going concern, the enterprise, and with it the employment of its workers, may fail. Although a solvent employer might be able to survive continuation of the status quo pending the protracted negotiations, including arbitration and mediation as provided for by § 6 of the RLA, a trustee or debtor-in-possession in charge of a carrier teetering on the brink of disaster would, if saddled by onerous executory terms of its predecessor's agreements, not be able to continue in business that long.[6] Indeed, REA, as debtor-in-possession, maintains that unless it carries out immediately the plan (Plan B–2) which it has initiated for drastic reductions in its service-center facilities and regional accounting offices, requiring substantial reductions in rates of pay and operational economies, it will not be able to continue in operation at all.

■ For these reasons we are persuaded that REA, as the debtor-in-possession in bankruptcy, is a new employer which, while obligated as a carrier to negotiate with its employees' collective bargaining representative, is not bound to follow the elaborate and protracted procedures of § 6 of the RLA before putting into effect its proposed terms of employment. Where its employees are represented, as here, by collective bargaining representatives, it is obligated merely to give reasonable notice of its proposed terms and to negotiate in good faith for a reasonable length of time before putting them into effect. In arriving at this conclusion we are not un-

mindful of the Supreme Court's dictum in *Burns* to the effect that there will be instances where, when a new employer retains all employees in a unit, it will be appropriate for the employer to consult with the employees' bargaining representative before fixing new terms, 406 U.S. at 294–95, 92 S.Ct. 1571. However, we do not interpret this exception as mandating that a new employer, pending negotiation of a new agreement with the union (which the debtor-in-possession here is obligated to undertake by § 2 of the RLA, 45 U.S.C. § 152) must adhere unqualifiedly to the terms of its predecessor's agreements. We read this suggested exception as being limited to those situations where employees are led at the outset by the successor-employer to believe that they will have continuity of employment on pre-existing terms and as not applying where the new employer dispels any such impression prior to or simultaneously with its offer to employ the predecessor's work force, *Spruce Up Corp.,* 209 NLRB No. 19, 85 LRRM 1426 (1974), see Note, *The Bargaining Obligations of Successor Employers,* 88 Harv.L.Rev. 759, 777–78 (1975).

In the present case REA as debtor-in-possession has not misled employees into the belief that it would adhere to pre-existing terms, conditions and scope of employment pending negotiations with the unions. On the contrary, the Chapter XI proceeding, which was widely publicized, put the unions and REA employees on notice that changes would be required to avert collapse of REA. The debtor-in-

---

**6.** As one commentator observed:

"It is doubtful that the Penn Central reorganization will continue long enough to enable its trustees to resolve the train crew dispute with the unions. It is even more doubtful that a Chapter X or XI proceeding for an airline can remain viable for the period required to exhaust the procedures of the RLA. Hence, the operation of that Act seems effectively to preclude the resolution of most labor relations disputes in a bankruptcy rehabilitation proceeding for a railroad or an airline. Moreover, the RLA seems also to preclude any interim relief from the onerous collective bargaining contract of a railroad or an airline in bankruptcy proceedings. Where the trustee, receiver or debtor in possession does not exercise the option to assume or reject such a contract, the Act forestalls the negotiation of a new and less onerous contract to apply while the proceedings are pending." *Countryman, Executory Contracts in Bankruptcy, Part II,* 58 Minn.L.Rev. 479, 498 (1974).

Section 77(n) of the Bankruptcy Act applies, of course, to the Penn Central, requiring it to follow the procedures prescribed by § 6 of the Railway Labor Act.

possession, furthermore, then initiated changes by putting into effect a series of retrenchments and economies designed to enable operations to be continued on a lesser scale, including the partial implementation of Plan B–2, deferred payment of 10% of its union payroll, and reduction in holiday pay.

Appellants further contend that, even if the district court had authority under § 313(1) of the Bankruptcy Act to authorize REA to reject the debtor's collective bargaining agreements with the unions, the district judge abused his discretion in granting such authority in this case, since he failed to balance the equities, including the employees' inability in Chapter XI proceedings to evaluate and obtain compensation for loss of their pension, welfare, seniority and other contract rights. See *Matter of Overseas National Airways, Inc.,* 238 F.Supp. 359, 361–62 (E.D.N.Y.1965). REA has countered by furnishing estimates of the dollar amounts that it would be obligated to pay under its agreement with BRAC if that agreement were continued in effect and estimates of the amounts which it proposes to save through consolidation and retrenchment under Plan B–2. However, in view of the serious effects which rejection has on the carrier's employees it should be authorized only where it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, the carrier will collapse and the employees will no longer have their jobs. Here the record fails to indicate clearly the extent to which each agreement precludes continued operation of REA, the extent to which the district court weighed the conflicting equities, or any findings by the court other than its statement that "in any ordinary sense of the words the two contracts are 'onerous and burdensome' ". We note, for instance, that while certain clauses of REA's contract with BRAC would impose heavy burdens on REA, at least some of these clauses do not appear in its contract with IAM. Accordingly, substantially for the reasons stated in remanding *Kevin Steel,* we remand the

case to the district court for further consideration and findings on the question of whether REA's agreements with BRAC and IAM are sufficiently onerous and burdensome to warrant an authorization to the debtor-in-possession to reject them.