765 F.2d 377
 119 L.R.R.M. (BNA) 3073, 103 Lab.Cas. P 11,548
 AIRLINE PILOTS ASSOCIATION, INTERNATIONAL, Plaintiff-Appellee,
v.
PAN AMERICAN WORLD AIRWAYS, INC., Defendant-Appellant,
FLIGHT ENGINEERS' INTERNATIONAL ASSOCIATION, PAA CHAPTER,
AFL-CIO, Plaintiff-Appellee,
v.
PAN AMERICAN WORLD AIRWAYS, INC., Defendant-Appellant.
 No. 876, Docket 85-7048.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 7, 1985.
Decided June 21, 1985.
 
 Harry A. Rissetto, Washington, D.C. (Thomas E. Reinert, Jr., Morgan, Lewis & Bockius, Washington, D.C., Ernest L. Garb, Richard Schoolman, Pan American World Airways, Inc., New York City, of counsel), for defendant-appellant.
 Michael E. Abram, New York City (Jay P. Levy-Warren, James L. Linsey, Christopher N. Souris, Cohen, Weiss & Simon, New York City, of counsel) for the plaintiff-appellee, Airline Pilots Ass'n, Intern.
 David Rosen, New York City (Asher Schwartz, O'Donnell & Schwartz, New York City, of counsel), for plaintiff-appellee, Flight Engineers' Intern. Ass'n.
 Before LUMBARD, MANSFIELD, and PIERCE, Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 In this appeal, we consider whether the "status quo" provision of Section 6 of the Railway Labor Act, 45 U.S.C. Sec. 156 (1982) ("Act"), prevents a carrier and a union[1] from agreeing upon the rates of pay, rules, and working conditions that are to be in effect during a contract renegotiation period even though they may differ from those in effect immediately prior to the expiration of the parties' collective bargaining agreement. Finding nothing in the Act or the relevant caselaw to support a conclusion that it does, we affirm the order of the district court which enforced such an agreement. 600 F.Supp. 746.
 
 BACKGROUND
 
 2
 Appellee Flight Engineers' International Association, PAA Chapter, AFL-CIO ("FEIA" or "Union"), is the exclusive collective bargaining representative of the flight engineers of Pan American World Airways, Inc. ("Pan Am"). On February 10, 1983, FEIA and Pan Am entered into a new basic agreement governing wages, benefits, and working conditions. This agreement was printed on white paper and is referred to by the parties as the "white pages." The duration provision of the basic agreement provides that it shall "continue in full force and effect until January 1, 1985, and thereafter unless written notice ... of intended changes is served at least ninety (90) days in advance of January 1, 1985 or any date thereafter, in accordance with Section 6, Title I of the Railway Labor Act, as amended."
 
 
 3
 Also, on February 10, 1983, the parties entered into a supplement to the basic agreement. This agreement, Supplement TT, which was printed on yellow paper and was contained "between the covers" of the basic agreement, is referred to by the parties as the "yellow pages." These yellow pages are a temporary revision of the basic agreement in which the union makes certain concessions regarding rates of pay and working conditions for the period ending January 1, 1985. Pan Am's agreement to terminate the concessions at the end of 1984 was the quid pro quo for the union's agreement to accept the concessions. The duration provision of the yellow pages provides that:
 
 
 4
 this Memorandum of Agreement is intended by the parties to provide temporary relief to the Company and is intended to remain in effect only until January 1, 1985, without the right of either party to renew it or any portion thereof nor is [sic] its terms to continue under Section 6 of the Railway Labor Act beyond January 1, 1985, except by mutual agreement.
 
 
 5
 This type of duration clause is commonly referred to as a "snapback" provision. The parties agree that, as contained in the yellow pages, its purpose is--and their intent was--to terminate, effective January 1, 1985, the concessions made therein and thereafter to continue in force during contract negotiations the non-concessionary provisions of the white pages.
 
 
 6
 By letter dated September 7, 1984, Pan Am informed the Union that it intended to open negotiations for a new contract pursuant to Section 6 of the Act. Sometime in November, 1984, Pan Am informed the Union that despite the yellow pages' snapback provision, it intended to continue the rates of pay, rules, and working conditions set forth in the yellow pages during the Section 6 status quo period following expiration of the agreement.
 
 
 7
 On December 20, 1984, FEIA commenced the instant suit in the United States District Court for the Eastern District of New York. The complaint alleged that Pan Am's announced intention not to comply with the duration provision of the yellow pages, by which the parties agreed to begin utilizing the white pages on January 1, 1985, would violate Sections 2 First, 2 Seventh, and Section 6 of the Act, 45 U.S.C. Secs. 152 First, 152 Seventh, and 156, and requested preliminary injunctive relief requiring Pan Am to comply with the snapback provision. On December 26, 1984, Judge McLaughlin held a hearing on appellee's motion for a preliminary injunction. At the close thereof, he consolidated the hearing on the preliminary injunction with trial on the permanent injunction, and issued a decision from the bench in which he granted the relief plaintiff requested. On January 8, 1985, the district court entered its final judgment and, in response to a motion by Pan Am, granted a ten day stay of judgment to permit the appellant to seek a stay in this Court pending appeal. On January 11, Judge McLaughlin published an opinion explaining his rationale for the January 8 judgment. Pan Am appealed and moved in this Court for a stay. By order dated January 14, 1985, we expedited the appeal and scheduled oral argument thereof concurrently with the hearing on the motion for a stay. After argument, we denied Pan Am's motion for a stay from the bench. Judge Lumbard dissented from this action.
 
 We now affirm.DISCUSSION
 
 8
 On appeal, as below, Pan Am contends that Section 6 of the Act makes illegal and unenforceable the yellow pages' snapback provision and affirmatively requires Pan Am, after January 1, 1985, to utilize the rates of pay, rules, and working conditions set forth in the basic agreement. The relevant portion of Section 6 provides:
 
 
 9
 Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice.... In every case where such notice of intended change has been given ... rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board....
 
 
 10
 45 U.S.C. Sec. 156 (emphasis added). Pan Am contends that this "status quo" provision requires that the parties continue with the concessionary working arrangements in effect at the time of the Section 6 notice. Pan Am also points to certain language in Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969) ("We have stressed that the status quo extends to those actual, objective working conditions out of which the dispute arose ..."), and our decision in Manning v. American Airlines, Inc., 329 F.2d 32 (2d Cir.), cert. denied, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964), in which we refused to give effect to what the carrier contended was a snapback provision in the parties' agreement. We find Pan Am's arguments unpersuasive.
 
 
 11
 Section 6 of the Act, upon which Pan Am relies, is part of an act which is aimed at preventing, "if possible, wasteful strikes and interruptions of interstate commerce." Shore Line, 396 U.S. at 148, 90 S.Ct. at 298. The Act is concerned chiefly with major disputes, that is, those involving formation--rather than interpretation--of collective bargaining agreements, and to accomplish its ends, "[i]t impose[s] upon the parties an obligation to make every reasonable effort to negotiate a settlement and to refrain from altering the status quo by resorting to self-help while the Act's remedies [are] being exhausted." Id. at 149, 90 S.Ct. at 298 (emphasis added).
 
 
 12
 The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. Sec. 6. The parties must confer, Sec. 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. Sec. 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. Secs. 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. Sec. 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. Secs. 2 Seventh, 5 First, 6, 10.
 
 
 13
 Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). "A final and crucial aspect of the Act was the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process.... '[T]he procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute.' " Shore Line, 396 U.S. at 149, 90 S.Ct. at 298 (quoting Railway Clerks v. Florida E.C.R. Co., 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966)). With this understanding of the Act--that its purpose is to encourage voluntary adjustment of disputes by preventing either party from resorting to self-help--we turn to Pan Am's contention that Section 6 prevents the parties from agreeing on what rates of pay, rules, and working conditions will be in force during the contract negotiation period. A brief review of the facts and circumstances of the cases that Pan Am cites in support of its argument will suffice to explain their inapplicability to the instant matter.
 
 
 14
 In Shore Line, the Supreme Court considered whether Section 6 of the Act prevented a carrier from assigning workers to outlying terminals when such assignments had not been made before, and when the union had filed a notice of intended change pursuant to Section 6. Prior to the dispute in Shore Line, the carrier had assigned all workers to a central terminal, where they would clock in and then be transported to any outlying assignments. The workers would not clock out until they returned to the central terminal. The existing contract between the carrier and union was silent as to the permissibility of directly assigning workers to outlying terminals where they would report at the beginning of the day. Against this background, the carrier announced its intention to begin making outlying assignments, and the union responded, serving a notice of intended change pursuant to Section 6 in which it requested a contract that would forbid outlying assignments. The union then sued to prevent the carrier from making the new assignments. The district court granted the requested relief, and the court of appeals affirmed.
 
 
 15
 The Supreme Court stated "that the status quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement." Id. at 153, 90 S.Ct. at 301. In focusing on "actual, objective working conditions," however, the Court did not mean to prevent the parties from entering into an agreement to utilize "rates of pay, rules, or working conditions" other than those in existence at the time when the Section 6 notice was filed. This interpretation of the Supreme Court's holding is strengthened by the Court's statements regarding the various status quo provisions of the Act:
 
 
 16
 There are three status quo provisions in the Act, each covering a different stage of the major dispute settlement procedures. Section 6 ... provides that "rates of pay, rules, or working conditions shall not be altered" during the period from the first notice of a proposed change ... through any proceedings before the National Mediation Board. Section 5 First provides that for 30 days following the closing [of such proceedings, the status quo shall be maintained]. Finally, Sec. 10 provides that after the creation of an Emergency Board [and for 30 days after it has made its report] "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose."
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 While the quoted language of Secs. 5, 6, and 10 is not identical in each case, we believe that these provisions, together with Sec. 2 First [which imposes on parties an obligation "to exert every reasonable effort" to settle disputes], form an integrated, harmonious scheme.... Although these three provisions are applicable to different stages of the Act's procedures, the intent and effect of each is identical so far as ... preserving the status quo is concerned.
 
 
 20
 Id. at 150-52, 90 S.Ct. at 299-300 (emphasis added and footnotes omitted). Accordingly, under the Supreme Court's interpretation of the Act, the effect of Section 6, at issue here, is to be considered identical to that of Section 10 which explicitly allows the parties to alter the status quo by agreement.
 
 
 21
 This Court, as well, has emphasized the importance of agreement--not only to the overall structure of the Act but also to determining the Section 6 status quo. See Air Cargo, Inc. v. Local Union 851, 733 F.2d 241, 246 (2d Cir.1984) (making clear that actual, objective working conditions constitute the Section 6 status quo only if both parties, either expressly or by their conduct, have indicated their consent to those conditions).
 
 
 22
 Nor is our decision in Manning v. American Airlines, Inc., 329 F.2d 32 (2d Cir.), cert. denied, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964), to the contrary. In Manning, we considered the effect of Section 6 on a dues check-off agreement which was separate from the parties' basic agreement. This check-off agreement was to "continue in full force and effect until April 30, 1963, and [would] be subject to renewal thereafter only by mutual agreement of the parties thereto." The parties' basic agreement, in contrast, was to "continue in full force and effect until April 30, 1963 and [would] renew itself without change until each successive April 30 thereafter unless written notice of intended change [was] served in accordance with Section 6." The carrier filed a Sec. 6 notice on March 8, 1963 and discontinued the check-off of dues on May 1, 1963. The issue was whether the status quo encompassed the dues check-off provision. During contract negotiations, the carrier argued that Section 6 did not operate to extend the life of the check-off arrangement, because the check-off agreement, unlike the basic agreement, had a fixed termination date warranting the conclusion that the parties did not mean to continue the check-off of dues during contract negotiations.
 
 
 23
 We concluded that Section 6 did continue in force the dues check-off arrangement. However, we explicitly declined to decide whether Section 6 prohibits parties from making agreements setting the rates of pay, rules, or working conditions that will be in effect during the contract negotiation period. Instead, we concluded that an interpretation of the two agreements therein as an attempt to define the Section 6 status quo would put "more strain on the words of the check-off agreement than these will bear." 329 F.2d at 34. The different language in the two agreements, in our view, meant only that automatic renewal of the basic agreement would not carry the check-off agreement with it. Id. In light of this language, we do not believe that Manning provides support for Pan Am's argument that the parties cannot, by explicit agreement, provide that temporary and concessionary terms will not be deemed part of the Section 6 status quo.
 
 
 24
 We have considered all of Pan Am's contentions, and we are unpersuaded by them. We see nothing in the Act, or the case law interpreting it, that prevents parties from setting, by freely negotiated agreement, the terms of employment which are to apply during the Section 6 status quo period. Indeed, the Act's purpose--to encourage the voluntary settlement of disputes--would be frustrated if Section 6 were interpreted to deprive a party of its negotiated arrangements. We also note that such an interpretation would discourage unions from agreeing to temporary concessions such as the ones at issue here. Concessionary arrangements, often very important to the continued success of financially-troubled companies, are only possible if both parties can be confident that their agreement will be enforced, and that concessionary terms will have a fixed termination date. We conclude that the Act, with its emphasis on the importance of agreement between the parties, requires that the agreement herein be enforced.
 
 CONCLUSION
 
 25
 Accordingly, the judgment of the district court is affirmed.
 
 
 
 [1]
 Airline Pilots Association, International v. Pan American World Airways, Inc., consolidated with the appeal of FEIA v. Pan Am, involved a dispute between Pan Am and its pilots virtually identical to that between the airline and its flight engineers discussed above. Subsequent to argument of the consolidated appeals, Pan Am and the Airline Pilots Association reached an agreement which now has been ratified by the union membership. This new agreement relates back to January 1, 1985 and consequently would appear to render the controversy between Pan Am and its pilots moot. The parties, in their latest submissions, have informed the Court that they have not yet agreed on final contract language. Consequently, the appeal has not been withdrawn and the Airline Pilots Association continues to be designated as an appellee in this opinion's caption. However, because the Airline Pilots Association's involvement in the case is now nominal, we will refer in our discussion of specific facts only to those relating to the dispute between Pan Am and FEIA