**In re AMR CORPORATION,
et al., Debtors.**

**Allied Pilots Association, Plaintiff,**

v.

**AMR Corporation and American
Airlines, Inc., Defendants.**

**Bankruptcy No. 11–15463 (SHL).
Adversary No. 12–01094 (SHL).**

United States Bankruptcy Court,
S.D. New York.

April 20, 2012.

Steptoe & Johnson LLP, By: Filiberto Agusti, Esq., Joshua Robert Taylor, Esq., James & Hoffman, P.C., By: Edgar N. James, Esq., Kathy L. Krieger, Esq., David P. Dean, Esq., Darin M. Dalmat, Esq., Washington D.C., for the Allied Pilots Association.

Weil, Gotshal & Manges LLP, By: Harvey R. Miller, Esq., Stephen Karotkin, Esq., Alfredo R. Pérez, Esq., Stephen A. Youngman, Esq., New York, NY, Paul Hastings LLP, By: John J. Gallagher, Esq., Neal D. Mollen, Esq., Margaret H. Spurlin, Esq., Washington, D.C., for AMR Corporation and American Airlines, Inc.

Skadden ARPS Slate Meagher & Flom LLP, By: Jay M. Goffman, Esq., New York, NY, John Wm. Butler, Jr., Esq., John K. Lyons, Esq., Felicia Gerber Perlman, Esq., Chicago, IL, or the Official Committee of Unsecured Creditors.

### MEMORANDUM OF DECISION

SEAN H. LANE, Bankruptcy Judge.

In the above-captioned adversary proceeding, the Allied Pilots Association (the "APA" or "Plaintiff") seeks a declaratory judgment that its most recent collective bargaining agreement (the "CBA") with debtor American Airlines, Inc. ("American") expired by its terms on May 1, 2008. The APA argues, therefore, that this expired contract cannot be rejected under Section 1113 of the Bankruptcy Code, which permits a debtor to reject a collective bargaining agreement under certain circumstances. American disagrees. It contends that the parties' CBA did not expire but rather became "amendable" by virtue of the Railway Labor Act, 45 U.S.C. § 151, *et seq.* (the "RLA"), which leaves the central terms of the parties' last agreement in place while they pursue the extensive negotiating path contemplated by the statute. Consistent with these "status quo" provisions of the RLA, the parties here have, in fact, continued their relationship under the terms of their most recent CBA.

American filed a motion to dismiss the adversary compliant. The APA opposed the motion and simultaneously moved for summary judgment. The parties agree that there are no material facts in dispute and that the current issue before the Court is a purely legal one. Following the reasoning of the Second Circuit and the vast majority of other circuit courts, the Court finds that the parties' CBA has not expired but rather became amendable under the RLA. Accordingly, the Court concludes that the CBA here is subject to Section 1113. The Court, therefore, denies the APA's motion for summary judgment and grants American's motion to dismiss.

### BACKGROUND

On November 29, 2011, AMR Corporation ("AMR Corp."), American (together

with AMR Corp., the "Debtors" or "Defendants") and certain of their subsidiaries filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

On February 28, 2012, the APA, the collective bargaining representative of approximately 10,000 American pilots, filed a complaint (the "Complaint") seeking entry of a declaratory judgment against the Debtors pursuant to 28 U.S.C. § 2201. The Complaint alleges that the CBA between American and the APA, effective May 1, 2003, expired pre-petition on May 1, 2008 pursuant to a duration clause in the agreement. That clause provides:

This Agreement shall become effective May 1, 2003, except as otherwise dated herein, and shall continue in full force and effect until May 1, 2008, and shall renew itself without change until each succeeding May 1 thereafter, unless written notice of intended change is served in accordance with Section 6, Title 1, of the Railway Labor Act, as amended, by either party hereto at least sixty (60) days prior to May 1, 2008, or May 1 of any subsequent year.

Section 26.C of the CBA, Ex. 1 to *Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue* [ECF No. 15] ("Plaintiff's Statement of Material Facts"); Complaint ¶ 9. The APA's Complaint seeks a declaration that (1) there is no binding collective bargaining agreement to "reject" under Section 1113(c) of the Bankruptcy Code; and (2) the Debtors may not "reject" or change any of the APA pilots' employment conditions that arise out of this expired CBA.

The parties agree that a notice of intended change, as contemplated by Section 26.C of the CBA, was properly served

under Section 6 of the RLA. More specifically, American issued a letter on July 21, 2006, stating that it wished to exercise its right to "commence negotiations to make changes in rates of pay, rules and working conditions for flight deck crewmembers covered by the current Agreement." Decl. of Neil Roghair ¶ 9, Ex. 1, *Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue* [ECF No. 15] ("Roghair Decl."); *see also* Complaint ¶ 10.

The parties also do not dispute that, after the Section 6 notice was served, they entered into negotiations for a successor agreement pursuant to Section 26.D of the CBA. Section 26.D of the CBA states that "[a]t any time following May 1, 2006, but prior to May 1, 2008, with sixty (60) days prior written notice by either party, the parties will commence negotiations in accordance with Section 6, Title I of the Railway Labor Act, as amended." Complaint ¶ 9.

Pursuant to Section 5 (First) of the RLA, the parties have mediated their labor dispute before the National Mediation Board ("NMB") and that process is ongoing. *See* Complaint ¶ 11; Roghair Decl. ¶ 18 (stating that the NMB mediation "continues to date"); Debtors' Counterstatement ¶ 20 (noting that the NMB is "continuing to mediate in negotiations" concerning the CBA).[1] On March 8, 2012, the APA sent formal written notice to the NMB of their intention to accept a proffer of final and binding arbitration for settlement of a new agreement and to request that the NMB make such proffer of arbitration promptly. *See* Ex. 4 to the Roghair Decl.; 45 U.S.C. § 60 (when NMB mediation fails to resolve a labor dispute under the RLA, parties may elect either

---

1. *See also* Hr'g Tr. 21:14–17, March 22, 2012 (Debtors' counsel stating that the parties are presently in the mediation phase which has been "almost interminable" and that parties

will "continue to be in mediation until the [NMB determines] that a release [is] appropriate").

binding arbitration or to seek resolution before the President of the United States who may establish a board to, among other things, "investigate promptly the facts as to the dispute and make a report thereon to the President."). Section 5 (First) of the RLA states that the NMB, as part of its efforts to "bring about an amicable settlement through mediation," may, as a last resort, "endeavor as its final required action ... to induce the parties to submit their controversy to arbitration." 45 U.S.C. § 155. The NMB, however, has yet to complete this "final required action" by making a proffer of arbitration. Complaint ¶ 11.

As the parties here remain in negotiations, the terms of the CBA remain in place consistent with Section 6 of the RLA, which provides that the "rates of pay, rules or working conditions" shall not be altered by the carrier until the controversy has been "finally acted upon ... by the [NMB]." 45 U.S.C. § 156.

On February 1, 2012, the Debtors submitted a proposal to the APA as part of an effort to initiate good faith bargaining under 11 U.S.C. § 1113, which provides that a debtor may seek to reject a collective bargaining agreement only if certain conditions are satisfied. These conditions include, among other things, that the debtor submit a proposal to the employees' authorized representative of the modifications to employee benefits that the debtor considers necessary for reorganization, and that the parties meet to confer on the proposal prior to the hearing on rejection of the collective bargaining agreement.[2] On March 27, 2012, the Debtors filed an application under Section 1113 of the Bankruptcy Code seeking to alter the terms of the CBAs with the APA and two other labor unions. *See* ECF No. 2035. Trial on the 1113 application is set to begin on April 23, 2012.

On March 9, 2012, the Debtors filed a motion to dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Fed.R.Civ.P. and Rule 7012 of the Federal Rules of Bankruptcy Procedure. On March 16, 2012, the APA filed a motion for summary judgment on its Complaint and opposed the motion to dismiss. On March 20, 2012, the Debtors filed a reply in support of its motion to dismiss and in opposition to the APA's summary judgment motion and a related counterstatement of undisputed facts, to which the APA responded on March 21, 2012. The Court heard oral argument on the parties' motions on March 22, 2012.

---

**2.** 11 U.S.C. § 1113(b) provides:

(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

## *DISCUSSION*

### A. *Applicable Legal Standards*

▇▇▇ The Declaratory Judgment Act provides, in part, that

in a case of actual controversy ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree....

28 U.S.C. § 2201(a). The purpose of the Declaratory Judgment Act is to "enable parties to adjudicate disputes before either of them [have] suffered great harm." *Russian Std. Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F.Supp.2d 376, 381 (S.D.N.Y.2007) (citing *In re Combustion*, 838 F.2d 35, 36 (2d Cir.1988)). In determining whether a party has standing to seek a declaratory judgment, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). A court has wide discretion in determining whether a declaratory judgment is appropriate in a particular dispute. *See Russian Std. Vodka*, 523 F.Supp.2d at 382 (citing *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 675 (2d Cir. 1996)). The Court finds that the present dispute regarding the applicability of Section 1113 to the CBA satisfies the requirements for a declaratory judgment.

In reviewing American's motion to dismiss pursuant to Rule 12(b)(6), this Court accepts the factual allegations set forth in the Complaint as true and draws all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir.2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir.2005). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Supreme Court in *Ashcroft v. Iqbal* set forth a two-pronged approach for courts deciding a motion to dismiss. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.2009). First, a court should begin by "identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678, 129 S.Ct. 1937. Next, the court shall consider the "factual allegations in [a] compliant to determine if they plausibly suggest an entitlement to relief." *Id.* In adjudicating a Rule 12(b)(6) motion, courts may consider:

(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the Complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the Complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may

properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co., Inc.,* 273 F.Supp.2d 351, 356–57 (S.D.N.Y.2003) (internal citations and quotations omitted), *aff'd in part and rev'd in part sub nom., Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir.2005), *cert. denied,* 546 U.S. 935, 126 S.Ct. 421, 163 L.Ed.2d 321 (2005).

In determining whether the APA is entitled to summary judgment, this Court must examine whether it has demonstrated "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (concluding that summary judgment is appropriate when the nonmoving party fails to make a sufficient showing on an essential element of a case for which the nonmoving party has the burden of proof); *Mark IV Indus. v. N.M. Envt. Dep't (In re Mark IV Indus.),* 438 B.R. 460, 464–65 (Bankr. S.D.N.Y.2010). A material fact is one that "might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (internal citations and quotations omitted). After the movant has made its initial showing, the opposing party must come forward with competent evidence that a genuine issue of fact exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (noting that after the moving party has met its burden under Rule 56(c), the opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts"). Mere conclusory allegations or unsupported speculations will not defeat a motion for summary judgment. *See id.* If the nonmoving party fails to establish the existence of an element essential to its case on which it will bear the burden of proof at trial, summary judgment should be granted in favor of the movant. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

## B. *The Statutory Framework*

■ The RLA was enacted by Congress in 1926 to regulate labor disputes in the railroad industry. The scope of the RLA was expanded in 1936 to incorporate air carriers. "[T]he primary goal of the RLA is to settle strikes and avoid interruptions to commerce" through use of the collective bargaining process. *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emp.,* 481 U.S. 429, 451, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987); *see Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 148, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) ("The Railway Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce."). To further this goal, the RLA places a high duty on carriers and their employees to resolve their labor disputes without interrupting service as they are required:

[T]o exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152.

■ Labor disputes are generally grouped into two types—major and minor—and the RLA provides different procedures for the resolution of each. Major disputes are characterized as seeking to

create contractual rights, while minor disputes relate to the enforcement of those rights. *See Consol. Rail Corp. v. Ry. Labor Exec. Ass'n,* 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (citing *Elgin, J & E.R. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)) (stating that the court adopts the major/minor terminology to describe the two classes of controversies Congress distinguished in the RLA). As such, major disputes "involve efforts to form, secure, or change the terms" of a collective bargaining agreement while minor disputes address "grievances or interpretation of existing agreements." *Northwest Airlines Corp. v. Ass'n of Flight Attendants (In re Northwest Airlines),* 349 B.R. 338, 352 (S.D.N.Y.2006), *aff'd,* 483 F.3d 160 (2d Cir. 2007).

### 1. *Minor Disputes*

 Under the RLA, parties involved in a minor dispute are first required to confer about the dispute. 45 U.S.C. § 152 (Sixth). Any unresolved issues must then be submitted to mandatory and binding arbitration before the National Railroad Adjustment Board or, in the case of the airline industry, an adjustment board established by the employer and the unions. 45 U.S.C. § 153. The adjustment board has "exclusive jurisdiction over minor disputes." *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n,* 491 U.S. 299, 304, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). In most circumstances, the decision of the adjustment board is final and judicial review is limited. *See id.* (stating that "[j]u-

dicial review of the arbitral decision is limited"); 45 U.S.C. § 153 (First)(p), (First)(q) (noting that a court called upon to settle disputes relating to a party's compliance with an order of the adjustment board or the adjustment board's failure to award grievances to an employee should consider the adjustment board's ruling as "conclusive"). While a court cannot rule on the merits of a minor dispute, it may compel a party to participate in the RLA procedures or enjoin strikes while the procedures are being exhausted. *See Consol. Rail,* 491 U.S. at 304, 109 S.Ct. 2477 (citing *Bhd. of R.R. Trainmen v. Chicago R. & I.R. Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957)).

### 2. *Major Disputes*

 By comparison, parties involved in a major dispute are subject to "an almost interminable process" under the RLA, which is "purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *Toledo Shore Line R.R. Co.,* 396 U.S. at 149, 90 S.Ct. 294.

A carrier must first provide "at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions . . . ." 45 U.S.C. § 156.[3] The parties must then enter into negotiations and bargaining regarding the dispute. 45 U.S.C. § 152 (Second).[4] Failing resolution, the parties are next subject to mediation before the NMB. 45 U.S.C. § 155 (First). This medi-

---

**3.** Section 2 (Seventh) states that "[n]o carrier, its officers, or agents shall change the rates of pay, rules or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title." 45 U.S.C. § 152 (Seventh).

**4.** "All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute." 45 U.S.C. § 152 (Second).

ation continues until either an agreement is reached or the NMB determines the mediation to be unsuccessful and releases the parties from the process. 45 U.S.C. § 155 (First).[5] If the NMB deems the mediation unsuccessful, it must attempt to persuade the parties to enter into arbitration; if either party refuses to arbitrate, the NMB will then release the parties from mediation and a mandatory thirty day cooling-off period commences. 45 U.S.C. § 155 (First). During this time, the President may appoint a presidential emergency board at the recommendation of the NMB. 45 U.S.C. §§ 155 (First), 160.[6] If an emergency board is not appointed and an agreement still has not been reached, the parties are then entitled to engage in self-help as to their dispute. *Id.*

▮▮▮ Up until the time that statutory procedures are exhausted, the parties are required to maintain the status quo and cannot unilaterally implement a disputed change in rates of pay, rules, or working conditions. *See Con. Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 302–303, 109 S.Ct. 2477, 105 L.Ed.2d 250 (U.S.1989). This status quo requirement is "central" to the design of the RLA:

> Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and per-

mits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

*Detroit & Toledo,* 396 U.S. at 149–151, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). The RLA does not make a direct reference to preserving the "status quo;" the source for the requirement is found in the interrelationship of the various timing provisions contained in the statute:

> Section 6 . . . provides that 'rates of pay, rules, or working conditions shall not be altered' during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board. Section 5 First provides that for 30 days following the closing of Mediation Board proceedings 'no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose,' unless the parties agree to arbitration or a Presidential Emergency Board is created during the 30 days. Finally, § 10 provides that after the creation of an Emergency Board and for 30 days after the Board has made its report to the President, 'no change, except by

---

5. "Although the Board has no statutory authority to compel the parties to reach agreement on any issue, it controls the timing and pace of mediation and has the power to determine whether to release the parties from mediation." THE RAILWAY LABOR ACT 22 (Michael E. Abram et al., eds., BNA Books, 2d ed. 2005).

6. If an emergency board is created, the parties must submit to an additional thirty day cooling-off period upon the board's submission of its report to the President. 45 U.S.C. § 160.

agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose.' These provisions must be read in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by § 2 First, 'to exert every reasonable effort' to settle disputes without interruption to interstate commerce. *Detroit & Toledo,* 396 U.S. at 150–51, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). "The obligation of both parties during a period in which any of these status quo provisions is properly invoked is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* at 152–53, 90 S.Ct. 294. The district courts retain subject-matter jurisdiction over violations of the status quo pending resolution of the RLA procedures. *See Consol. Rail,* 491 U.S. at 302–303, 109 S.Ct. 2477.

### 3. *The Duration of Airline Collective Bargaining Agreements*

Airline collective bargaining agreements generally contain terms describing the length or duration of the contract. Referred to as duration clauses, they will often specify an "amendable date," which is a "date on which [the contract] becomes 'amendable' if a party serves a timely notice of intent to change the agreement under Section 6 of the RLA." THE RAILWAY LABOR ACT, *supra* note 5, at 13; *Marcoux v. American Airlines, Inc.,* 645 F.Supp.2d 68, 71 n. 3 (E.D.N.Y.2008) (citing *In re Northwest Airlines,* 349 B.R. at 349 n. 4).

### C. *The APA's CBA Was Not Terminated But Instead Became Amendable Under the RLA*

 In arguing that its CBA has been terminated, the APA relies on the Second Circuit's decision in *Manning v. American Airlines, Inc.,* 329 F.2d 32 (2d Cir.1964). In *Manning,* the Second Circuit Court of Appeals analyzed the duration clauses in two separate but related labor contracts. The first was a "basic agreement," which contained language similar to the duration clause in the APA's CBA. The duration clause of the basic agreement would "continue in full force and effect until April 30, 1963 and shall renew itself without change until each successive April 30 thereafter unless written notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act, as amended, by either party hereto at least sixty (60) days prior to April 30 in any year after April 30, 1962." *Id.* at 33. As to this basic agreement, the Court stated that "the current effectiveness of the wage and hour clauses of the basic agreement ... [was] due solely to the second sentence of § 6, since automatic renewal was prevented" by the notices of proposed change. *Id.* The second agreement in *Manning* related to a check-off for union dues and was to "continue in full force and effect until April 30, 1963, and [was] subject to renewal thereafter only by mutual agreement of the parties hereto." *Id.* The Second Circuit concluded that this check-off agreement had, in fact, expired on April 30, 1963, but that the status quo provisions of Section 6 nonetheless applied to extend the terms of the check-off agreement.

Noting that both the basic and check-off agreements in *Manning* were extended consistent with Section 6, the APA argues that the *Manning* Court found that both these agreements had expired. While the *Manning* Court explicitly found that the check-off agreement was "expired" based upon the plain language of its terms, nowhere did it conclude that the basic agreement had expired. *Id.* at 35. In fact, the *Manning* Court did not make any holding

as to the basic agreement, which is not surprising given that the only issue on appeal related to the check-off agreement. But to the extent the court in *Manning* expressed a view about the termination of collective bargaining agreements under the RLA, its view is squarely at odds with the APA's argument here as the Second Circuit observed that "[t]he effect of § 6 is to prolong agreements subject to its provisions regardless of what they say as to termination." *Id.* at 34.

*Manning's* notion that Section 6 extends the life of collective bargaining agreements—and not merely their terms—is consistent with the interpretation of the RLA by both the district court and the Second Circuit in *In re Northwest Airlines.* At issue in *Northwest* was whether, following the rejection of a collective bargaining agreement under Section 1113, a court may enjoin a union from striking in response to such rejection. 349 B.R. at 344. In reviewing the decision of the bankruptcy court, the district court specifically considered whether, prior to rejection, the old agreement "existed by reason of the contract itself or by reason of the invocation of the RLA's status quo provisions, leaving the last valid agreement in place even after its expiration date while new terms are negotiated." *Id.* at 349 n. 4. The agreement in *Northwest* had a duration clause like the one in the APA's CBA and the operative date had passed before the Section 1113 application was filed. The district court in *Northwest* observed that some courts had disagreed with the effect of such a duration clause. It observed that the Ninth Circuit had concluded that such agreements terminated or expired on the amendable date but that the Second and Seventh Circuits had both concluded that "Section 6 artificially extends the life of such agreements." *Id.* (citing, *inter alia, Manning,* 329 F.2d at 34); *Air Line Pilots Ass'n, Int'l v. UAL Corp.,* 897 F.2d 1394, 1398 (7th Cir.1990).

The reasoning of the Second Circuit in *Northwest* reflects the same understanding. Citing *Manning,* the Court observed that "a collective bargaining agreement between a carrier subject to the RLA and its employees or their union ... hardly ever expires." *Northwest Airlines Corp. v. Ass'n of Flight Attendants–CWA (In re Northwest Airlines),* 483 F.3d 160, 167 (2d Cir.2007) (citing *Manning,* 329 F.2d at 34). The Court further explained that "[o]nly after the parties have fully exhausted the dispute resolution and re-negotiation processes does a CBA expire, freeing the parties from their contractual obligations and the RLA's rules governing the preservation of the status quo." *Id.* Ultimately, the Court found that such a collective bargaining agreement continues in existence until rejection under Section 1113 of the Bankruptcy Code: "Northwest's rejection of its CBA after obtaining court authorization to do so under 11 U.S.C. § 1113 abrogated (without breaching) the *existing collective-bargaining agreement* between the AFA and Northwest, which thereafter ceased to exist...." *Id.* at 169–70 (emphasis added). The Court noted the central role that the parties' agreement played during the status quo period in observing that "[t]he RLA's explicit status quo provisions attach to 'rates of pay, rules, or working conditions ... *as embodied in agreements....'" Id.* at 173 (emphasis in original) (quoting 45 U.S.C. § 152 (Seventh) and citing 45 U.S.C. § 156). Thus, it concluded that "[t]he plain text of these [status quo] provisions compels the conclusion that they do not apply after a carrier has abrogated its CBA and the "agreement" has ceased to exist.... The RLA does not contemplate the inauguration of a new status quo absent the mutual agree-

ment of labor and management." *Id.* (internal citations and quotations omitted).[7]

The APA argues that the views of the courts in *Northwest* are dicta because no party appealed the bankruptcy court's rejection of the old agreement under Section 1113. But the predicate for both the district court and the Second Circuit's decision was the rejection of a collective bargaining agreement where the rejection took place well after the agreement's amendable date. *In re Northwest Airlines*, 349 B.R. at 349 n. 4 (agreement rejected under Section 1113 had amendable date of June 1, 2005 and the bankruptcy was filed September 2005). And while the district court did not ultimately rule upon the precise basis for the existence of the rejected agreement, it clearly viewed— and those parties did not dispute[8]—that an agreement existed for purposes of Section 1113. *In re Northwest Airlines*, 349 B.R. at 344 n. 4. Similarly, the Second Circuit in *Northwest* carefully parsed the effect of Section 1113 on the parties' preexisting relationship in considering whether the union had a right to strike.

*In re Northwest Airlines*, 483 F.3d at 169–70 (holding that Northwest's rejection under Section 1113 abrogated "the existing collective-bargaining agreement between the AFA and Northwest").

The outcome here also is consistent with the application of Section 1113 in *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984 (2d Cir. 1990). In *Ionosphere*, the Second Circuit addressed a collective bargaining agreement between Eastern Airlines and its pilots that had reached its amendable date prior to the filing of the bankruptcy case.[9] Notwithstanding that fact, the Court held that Section 1113 applied to the collective bargaining agreement and, in fact, was the sole means for the debtor to terminate or modify a collective bargaining agreement in bankruptcy. *Id.* at 989–90. Thus, the Court held that Eastern was not permitted to modify or amend its collective bargaining agreement through the automatic stay provisions of Section 362 of the Bankruptcy Code because such a result "would allow Eastern unilaterally to alter the collec-

7. Nor does the implicit status quo requirement of Section 2 (First) apply in the absence of a collective-bargaining agreement to which both carrier and union have assented. First, like the explicit status quo provisions, Section 2 (First) refers to "agreements" between the parties, 45 U.S.C. § 152 (Second), not court-approved terms and conditions of employment opposed by one party.
*In re Northwest Airlines*, 483 F.3d at 173.

8. As the Debtors note, unions in other cases have endorsed the proposition that a collective bargaining agreement under the RLA continues notwithstanding the arrival of its amendable date. *See Northwest Airlines Corp. v. AFA*, Adv. Proc., No. 06–01679–alg, Brief of Air Line Pilots Ass'n (ECF Doc. 8, filed Aug. 8, 2008), page 14 of 26 (S.D.N.Y.) ("RLA collective bargaining agreements do not expire; they become subject to amendment under the processes of Section 6 of the RLA.");

*In re Mesaba Aviation, Inc.*, 341 B.R. 693, 710 n. 18 (Bankr.D.Minn.2006) (testimony of AFA's General Counsel that collective bargaining agreements under RLA "do not have a fixed term at the close of which they are extinguished in legal effectiveness. Rather, they identify a starting date and an 'amendable date' ").

9. ALPA and Eastern were parties to successive collective bargaining agreements for over forty-five years, with the most recent agreement becoming amendable (i.e., subject to renegotiation) on July 1, 1988. *Air Line Pilots Ass'n Int'l v. Eastern Air Lines, Inc. (In re Ionosphere Clubs, Inc.)*, 105 B.R. 761, 762, 765 (Bankr.S.D.N.Y.1989). The bankruptcy case was filed on March 9, 1989, and applications under Section 1113 to reject this agreement were filed in June 1989 and April 1990. *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 139 B.R. 772, 775 (S.D.N.Y.1992).

tive bargaining agreement by avoiding its obligation to arbitrate." *Id.* at 992.

Moreover, the vast majority of other Circuits have similarly concluded that a duration clause in a collective bargaining agreement under the RLA does not terminate the agreement on the assigned date but instead renders the agreement amendable. As the Seventh's Circuit has explained:

> [C]ollective bargaining agreements governed by the Railway Labor Act do not expire on their expiration dates. The Act abhors a contractual vacuum. If on the date of expiration the parties have not negotiated a replacement agreement (and they had not here, and still have not), the old agreement continues in force.

*UAL Corp.,* 897 F.2d at 1398. The Seventh Circuit has found "too metaphysical for [its] taste the argument that the agreement terminates on the date specified in the contract even though the employer cannot on termination make any changes." *EEOC v. United Air Lines,* 755 F.2d 94, 97 (7th Cir.1985) (noting that an employer "continues subject to [the CBA], notwithstanding the arrival of the "termination date" date [because,] realistically, the contract remains in force.").[10] The Eighth Circuit reached the same conclusion in *Trans World Airlines v. Indep. Fed'n of Flight Attendants,* 809 F.2d 483 (8th Cir.

1987). Interpreting a duration provision similar to the one at issue here,[11] the Eighth Circuit rejected the argument that the CBA had expired by its own terms, thus entitling the parties to self-help. Instead, it agreed with the district court's interpretation of the contract as amendable in accordance with its provisions and the RLA: "The contract in question is amendable in accordance with its provisions and the Railway Labor Act. It does not wholly terminate, either automatically or upon service of notice of a limited number of intended changes." *Id.* at 490 (quoting *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants,* 640 F.Supp. 1108, 1114 (W.D.Mo.1986)).[12]

Moreover, there seems to be little policy justification for prohibiting the application of Section 1113 to a debtor like American that continues to have an ongoing relationship with its unions that is governed by the terms of the parties' latest collective bargaining agreement. Of course, significant economic challenges to management and labor can often result in collective bargaining negotiations extending past the amendable date of the existing agreement. *See generally In re Northwest Corp.,* 349 B.R. at 349 n. 4; *In re Ionosphere Clubs, Inc.,* 922 F.2d 984 (2d Cir.1990) and *supra* note 9. But the APA's position would bar the availability of Section 1113 to such cases where the statute is arguably most rele-

---

**10.** *See United Air Lines,* 755 F.2d at 99 ("[S]ervice of the [Section 6] notice is the mode of amendment, implying that what is not sought to be changed continues in effect. November 1 really isn't a termination date at all; it is the date before which no changes can be made.")

**11.** The language of the agreement in *Trans World Airlines* provided: "[T]his entire Agreement shall be effective August 1, 1981 [and] shall remain in effect until July 31, 1984 and thereafter shall renew itself without change for yearly periods unless written notice of

intended change is served in accordance with Section 6, Title 1 of the Railway Labor Act, as amended, by either party hereto, at least 90 days prior to the renewal date in each year." 809 F.2d at 484.

**12.** Thus, even if this Court agreed with the APA's view that *Manning* and *Northwest* are dicta, the Court would be persuaded that this CBA is amendable in light of the Second Circuit's decision in *Ionosphere* and the persuasive reasoning of other federal courts of appeal.

vant. *See N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation . . . beneficial recapitalization could be jeopardized if the debtor-in-possession were saddled automatically with the debtor's prior collective-bargaining agreement.")

Against the weight of this authority, the APA relies on a line of cases from the Ninth Circuit, including *Int'l Ass'n of Machinists and Aerospace Workers v. Aloha Airlines, Inc.,* 776 F.2d 812 (9th Cir.1985). In *Aloha,* the Ninth Circuit considered the issue of whether a dispute between parties governed by a collective bargaining agreement constituted a major dispute or a minor dispute under the RLA. The collective bargaining agreement in *Aloha* contained a duration clause that mirrored the language of the APA's CBA. The union had filed a Section 6 notice, the parties had begun to negotiate and the dispute had moved into mediation. The union argued that the dispute was minor and therefore under the exclusive jurisdiction of the System Board of Adjustment, while the airline said that it was a major dispute, within the jurisdiction of the federal courts. The Ninth Circuit concluded that the contract had expired by its terms because a Section 6 notice had been filed. As of its expiration, therefore, "[t]here was simply no existing collective bargaining agreement to interpret. There is nothing in the Railway Labor Act which extends a contract beyond its termination date." *Aloha,* 776 F.2d at 816. Nonetheless, the parties were required to "observe the wages, hours and working conditions set out in the agreements . . . because . . . the Act creates a statutory status quo." *See id.* Because the collective bargaining agreement no longer existed, the dispute between the parties necessarily involved the terms of a future agreement and therefore

constituted a major dispute. *See id.* at 816.

But the APA fails to acknowledge that *Aloha's* reasoning has not been adopted by the Second Circuit or other Circuits. It also ignores that the *Aloha* decision has been criticized by various courts, including the D.C. Circuit in *Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.,* 863 F.2d 891 (D.C.Cir.1988). In *Eastern Air Lines,* the D.C. Circuit concluded that *Aloha's* interpretation of the RLA did damage to the scheme contemplated by Congress:

> *Aloha* appears to ignore the purposes behind the RLA's bifurcated dispute resolution procedure. . . . [T]he consequence of the *Aloha* rule is that after the filing of a § 6 notice and the expiration of a bargaining agreement, no dispute between the parties can proceed along the track devised by Congress for "minor" disputes.

*Id.* at 899; *see also Miklavic v. USAir, Inc.,* 21 F.3d 551, 554 (3d Cir.1994) (stating that "to follow *Aloha* would mean that every dispute, no matter how firmly based in the existing but expired contract and no matter how insignificant, would become a major dispute subject to federal court jurisdiction. The *Aloha* rule upsets settled law governing post-expiration disputes that the mere filing of a section 6 notice does not turn a minor dispute into a major one.").

Even courts within the Ninth Circuit have doubted the continued validity of *Aloha. See Alaska Airlines v. Int'l Ass'n of Machinists and Aerospace Workers,* 2005 WL 1330976 (W.D.Wash. June 2, 2005). In *Alaska Airlines,* the parties disagreed about whether a particular dispute was major or minor under the RLA. The defendants maintained that the dispute was major because the bargaining agreement in question had expired and there "was

simply no existing collective bargaining agreement to interpret." *Id.* at *4 (citing *Aloha Airlines*, 776 F.2d at 816). The court in *Alaska Airlines* rejected that argument, noting that *Aloha* was no longer controlling law in light of the Supreme Court's decision clarifying the definition of a major and minor dispute in *Consol. Rail Corp.*, 491 U.S. at 307, 109 S.Ct. 2477 (explaining that a dispute is minor if the action is "arguably justified by the terms of the parties' collective bargaining agreement").

The APA presents four other arguments to support its interpretation of the duration clause, none of which are persuasive. First, the APA argues that the unique language of its CBA evidences an intent by the parties to terminate the CBA at the specified date, rather than make it amendable. *See APA's Memorandum of Law in Opposition to Debtors' Motion to Dismiss and In Support of APA's Motion for Summary Judgment* [ECF No. 14], at 12 ("APA's Memorandum of Law"). But the plain language of the CBA does not support the APA's argument. Unlike the language at issue in other cases, the duration clause here does not use the word "terminate," nor does it profess a specific intent for the agreement to terminate. *See Manning v. American Airlines, Inc.*, 329 F.2d at 33 (check-off agreement stated that it was "to continue in full force and effect until April 30, 1963, and shall be subject to renewal thereafter only by mutual agreement of the parties hereto."); *Air Line Pilots Ass'n, Int'l. v. Pan American World Airways, Inc.*, 600 F.Supp. 746, 748 (E.D.N.Y.1985) (temporary revisions to basic agreement stated that they "shall terminate in all respects at 2400 hours on December 31, 1984.... *The Company explicitly waives any and all rights whatsoever to claim that any of the temporary revisions ... remain in effect after 2400 hours on December 31, 1984....*"). Rath-er, the language here is comparable to agreements found to be amendable by the courts. *See Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 809 F.2d at 484 (duration clause stated that "[e]xcept as otherwise specified in this Agreement, this entire Agreement shall be effective August 1, 1981 [and] shall remain in effect until July 31, 1984 and thereafter shall renew itself without change for yearly periods unless written notice of intended change is served in accordance with Section 6, Title 1 of the Railway Labor Act, as amended, by either party hereto, at least 90 days prior to the renewal date in each year."); *EEOC*, 755 F.2d at 97 (duration clause in collective bargaining agreement stated that the agreement, "shall remain in full force and effect through November 1, 1978, and thereafter shall be subject to change by service of notice as provided for in Section 6" of the RLA).

The unremarkable nature of the language here is confirmed by its similarity to the language of the "typical clause" under the RLA:

> In the airline industry, contracts generally contain duration terms, which specify what is commonly known as the amenable date. The typical clause, at least in the published decisions, provides that the agreement will 'continue in full force and effect until [the amendable date] and thereafter,' either indefinitely or on a year-to-year basis, 'unless written notice of intended change is served in accordance with Section 6 of the Railway Labor Act' within a specified period, such as thirty to ninety days, prior to the amendable date.

THE RAILWAY LABOR ACT, *supra* note 5, at 376–77.

Second, the APA urges this Court to look to decisions under the National Labor Relations Act (the "NLRA") for guidance

in deciding this issue under the RLA. The APA contends that these NLRA cases support its view that a collective bargaining agreement is not subject to rejection under Section 1113 where the agreement has expired by its terms. As a threshold matter, the APA's argument ignores the Supreme Court's admonition against importing the NLRA "wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes." *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989) (quoting *Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, at 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969)).

In fact, the RLA and the NLRA have different purposes. The primary purpose of the RLA is " 'to settle strikes and avoid interruption to commerce.' " *In re Northwest Airlines*, 349 B.R. at 352 (quoting *Burlington N. R.R. Co.*, 481 U.S. at 451, 107 S.Ct. 1841) (collecting cases). The RLA provides an "elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation[,]" thereby imposing a duty on the parties "to make every reasonable effort to negotiate a settlement and to refrain from altering the status quo" until the RLA's remedies had been exhausted, making it "an almost interminable process." *Detroit & Toledo*, 396 U.S. at 148–149, 90 S.Ct. 294 (1969). Thus, " 'the procedures of the [RLA] are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement

that resolves the dispute.' " *Id.* (quoting *Bhd. of Ry. & Steamship Clerks, etc. v. Florida E.C.R. Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966)). In contrast, the NLRA was created to provide a separate, regulatory scheme for resolving labor disputes in additional industries not covered under the RLA. THE RAILWAY LABOR ACT, *supra* note 5, at 2; *In re San Rafael Baking Co.*, 219 B.R. 860, 864 (9th Cir. BAP 1998). The NLRA "promote[s] industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers[,] . . . by protecting employees' rights to organize for collective bargaining and by imposing on labor and management the mutual obligation to bargain collectively." *N.L.R.B. v. American Nat. Ins. Co.*, 343 U.S. 395, 401–402, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). Given the NLRA's "duty to bargain," an employer that alters the employment agreement's terms and conditions during negotiations, even if the agreement has terminated, is in violation of the NLRA; the parties must first bargain to impasse. *N.L.R.B. v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). But such an impasse is not difficult to demonstrate as the NLRA "does *not* encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position." *American Nat. Ins. Co.*, 343 U.S. at 404, 72 S.Ct. 824 (1952) (emphasis added).[13]

Even considering the substance of these NLRA cases, the Court is not convinced that they are helpful in resolving the in-

---

**13.** Moreover, unlike the RLA, the NLRA does not generally prohibit a union from resorting to self-help by striking during the term of the collective bargaining agreement. THE RAILWAY LABOR ACT, *supra* note 5, at 15; *N.L.R.B. v. Magnavox Co. of Tennessee*, 415 U.S. 322, 326, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974) (noting that the union may waive its right to

strike in exchange for employer agreeing to grievance and arbitration); *N.L.R.B. v. Fed. Sec., Inc.*, 154 F.3d 751, 755 (7th Cir.1998) ("The general rule under the NLRA is that employees have the right to strike for the purpose of mutual aid and protection, but the right is not absolute. A bargaining agreement itself may rule out a strike . . . .").

stant dispute. A review of the less than dozen arguably applicable cases reveals a split of authority. There are a number of cases that appear to support the application of Section 1113 to collective bargaining agreements under the NLRA even after those agreements have "expired" [14] while a handful of other cases appear to suggest that Section 1113 cannot be used to reject such an expired contract.[15] But of all the cases cited by the parties, only one would be binding authority on this Court: *Century Brass Products, Inc. v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am (In re Century Brass Products, Inc.)*, 795 F.2d 265 (2d Cir.1986). Nothing from *Century Brass*, however, provides any guidance on the question before the Court,[16] and thus

---

**14.** The Debtors rely on the following cases: *In re Karykeion, Inc.*, 435 B.R. 663, 674 (Bankr.C.D.Cal.2010) ("Section 1113's language and purpose indicate that it allows a debtor to terminate or modify its ongoing obligations to its organized workforce, whether those arise as a result of a current or expired CBA."); *United Food & Commercial Workers Union, Local 770 v. Official Unsecured Creditors Comm. (In re Hoffman Bros. Packing Co.)*, 173 B.R. 177, 184 (9th Cir. BAP 1994) ("[T]he terms of a CBA *status quo ante* continues in effect until an impasse has been reached because the LMRA [Labor Management Relations Act] so mandates[,] ... since the basic purpose of § 1113 is meant to grant ultimate jurisdiction to the bankruptcy court to accept, modify, or otherwise alter or terminate the status *quo ante* rights and obligations between a debtor employer and its employees, whether they are established under a currently existing CBA or pursuant to the LMRA."); *United Steelworkers of America v. Ormet Corp. (In re Ormet Corp.)*, 2005 WL 2000704, at *2 (S.D.Ohio Aug. 19, 2005) (noting that the bankruptcy court rejected the argument that Section 1113 is inapplicable to expired CBAs and that "§ 1113 does not use the term 'executory' in describing what type of collective bargaining agreements can be rejected"); *Accurate Die Casting Co.*, 292 N.L.R.B. 982, 988 (1989) (Section 1113 does not refer to "executory" contracts and period when the contract "continues in effect ... includes a period when its replacement is being negotiated and in which no impasses has been reached").

**15.** The APA relies on the following cases: *In re Charles P. Young Co.*, 111 B.R. 410, 413 (Bankr.S.D.N.Y.1990) (rejection of a collective agreement under Section 1113 is moot if the agreement expires by the specified date and prior to a hearing on rejection and Section 1113(f) "incorporates an underlying assumption that there is an existing [contract]

to reject or modify"); *In re San Rafael Baking Co.*, 219 B.R. at 864 (in the context of a claims hearing, only the NLRB had the authority to interpret the NLRA and bankruptcy court did not have authority to alter an expired agreement); *Gloria Mfg. Corp. v. Int'l Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir.1984) (once a contract has expired before the debtor obtained court approval to reject it, the contract was no longer executory under Section 365; therefore, there was nothing to reject or assume); *In re Pesce Baking Co., Inc.*, 43 B.R. 949, 957 (Bankr.N.D.Ohio 1984) (relying on *Gloria Mfg. Corp.*, once an agreement expires by the specified date, it is no longer executory; therefore, the debtor's motion to reject such an agreement becomes moot); *In re Sullivan Motor Delivery, Inc.*, 56 B.R. 28 (Bankr.E.D.Wisc.1985) (Section 1113 could not be utilized to reject an expired agreement, and where an agreement expired by its own terms, the parties' rights and obligations are within the sole purview of the NLRB); *In re Leslie Fay Co., Inc.*, 168 B.R. 294, 300 (Bankr.S.D.N.Y.1994) (collective bargaining agreements are executory contracts and nothing in the statute's legislative history and the statute itself indicate that Section 1113 is applicable to postpetition agreements); *Century Brass Products, Inc. v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am (In re Century Brass Products, Inc.)*, 795 F.2d 265, 272 (2d Cir.1986) (in the context of determining whether the debtor complied with Section 1113's procedural requirements, employers may only modify an existing contract provided the modifications are necessary for an effective reorganization).

**16.** The question before the Second Circuit in *Century Brass* was whether the debtor made a proposal to the employee's authorized representative under the agreement as required

the case provides no basis to ignore the existing precedent in this Circuit from *Manning, Northwest,* and *Ionosphere.* The remaining cases reflect a developing area of the law, with little of the consensus present in the case law on this issue under the RLA.

Third, the APA relies on a number of distinguishable cases. For example, the APA cites cases where, unlike here, the RLA bargaining process had concluded and the parties had been released from their obligations under the collective bargaining agreement. *See Flight Engineers Int'l Assn. v. Eastern Air Lines, Inc.,* 359 F.2d 303, 310 (2d Cir.1966) ("Negotiations between the parties continued intermittently until February 1962, and were followed by the appointment of a presidential emergency board under Section 10 of the Act. The Board filed its report to the President on May 1, 1962, and the freezing of the situation which had been caused by the appointment of the emergency board ended thirty days later. After June 1, 1962, the contract was no longer in effect and the union was free to strike.... Unlike the collective bargaining agreement considered in *Manning* ... the status quo provisions of the Railway Labor Act had ceased to operate."); *see also Pan American World Airways, Inc. v. Int'l Brotherhood of Teamsters,* 894 F.2d 36 (2d Cir. 1990) ("The Mediation Board subsequently terminated mediation, and after the statutory cooling-off period mandated by the RLA expired on February 21, 1988, both parties were legally free to engage in economic self-help measures."); *Int'l Assn. of Machinists and Aerospace Workers v. Reeve Aleutian Airways, Inc.,* 469 F.2d 990, 992 (9th Cir.1972) ("Negotiations followed between the company and the union, and on April 3, 1968, the company requested the services of the National Mediation Board. Bargaining continued with the assistance of a mediator of the Board without success. On September 11, 1968, the Board suggested arbitration, but the union declined. On September 18, 1968, the Board notified the parties of the termination of its mediatory efforts and informed them that they were required to maintain the status quo for thirty days thereafter. On October 19, 1968, having been unable to resolve their differences, the union called a strike against the company.").[17]

Fourth and finally, the APA cites to a number of cases for the proposition that there is a large body of law "finding no authority to assume or reject non-executory contracts." APA's Memorandum of Law at 18. Most of these cases involve the application of Section 365 of the Bankruptcy Code, with some involving non-labor disputes and others having been decid-

pursuant to Section 1113(b)(1)(A). The Second Circuit held that the UAW cannot represent both current and retired employees given the divergent interest of both groups. Nothing in *Century Brass,* however, addressed whether a bankruptcy court is authorized to reject a collective bargaining agreement that has become amendable by the specified date.

**17.** Similarly, *Air Cargo, Inc. v. Local Union 851, Int'l Bhd. of Teamsters,* 733 F.2d 241 (2d Cir.1984), offers no support for the APA's argument. The APA cites to *Air Cargo* for its characterization of a collective bargaining agreement as "expired." The case, however, contains no discussion of the agreement's duration clause and only mentions in passing that the contract has expired. The case offers no legal reasoning that can be relied upon, a fact noted by several other courts. *See Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants,* 809 F.2d at 488 (8th Cir.1987) ("While the court referred to the expiration of the agreement in that case, the discussion does not indicate that the contract between the union and the employer contained a duration clause providing for automatic renewal as in the airline contract at issue here."); *Air Line Pilots Ass'n, Int'l. v. Eastern Air Lines, Inc.,* 863 F.2d 891, 898 (D.C.Cir.1988).

ed prior to the enactment of Section 1113. It would be inappropriate, however, to rely on Section 365 to circumscribe the application of Section 1113 given that Congress—knowing full well of the existence of Section 365—enacted section 1113 specifically to permit the rejection of collective bargaining agreements in the aftermath of the Supreme Court's decision in *Bildisco. See Bildisco,* 465 U.S. 513, 104 S.Ct. 1188 (concluding that statutory labor law obligations were subordinated to the exigencies of bankruptcy and permitting the rejection of debtors' collective bargaining agreements), *superseded by statute,* 11 U.S.C. § 1113; *In re Century Brass Products,* 795 F.2d at 272 (stating that Section 1113 "created an expedited form of collective bargaining with several safeguards designed to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion.").

### CONCLUSION

For the reasons set forth above, the APA's summary judgment motion is denied. Given that the Court's ruling relies only upon undisputed facts referenced in the Complaint, American's motion to dismiss is granted.[18] The Debtors are directed to settle an order on three days' notice.

---

**18.** The Complaint references the CBA, including the specific language of the duration clause. Complaint, ¶ 9. The only other material facts to this dispute are that a Section 6 notice was served, Complaint ¶ 10, that the parties continue to negotiate under the auspices of the NMB and that the RLA negotiation process has not yet concluded. Complaint, ¶ 11. *See SEC v. Reserve Mgmt. Co. (In re Reserve Fund Sec. & Derivative Litig.),* 732 F.Supp.2d 310, 318 (S.D.N.Y.2010) (citing *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993)) ("When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' ... complaint, ... to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.").